UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Newport News Division


COREY MOODY,

                Plaintiff,

v.                                        Civil No. 4:14cv99

THE CITY OF NEWPORT NEWS,
VIRGINIA, JAMES D. FOX,
IN HIS OFFICIAL CAPACITY,
RICHARD W. MYERS, IN HIS
OFFICIAL CAPACITY, DANIELLE
HOLLANDSWORTH, INDIVIDUALLY,
RUSSEL TINSLEY, INDIVIDUALLY,
RANDY GIBSON, INDIVIDUALLY,
and RYAN NORRIS, INDIVIDUALLY,

                Defendants.

## OPINION AND ORDER

On December 12, 2012, Plaintiff Corey Moody ("Plaintiff") suffered gunshot wounds and sustained permanent injuries during a traffic stop and arrest for federal drug and gun charges. Compl., ECF No. 1. Due to the events that transpired during the traffic stop, Plaintiff filed suit, pursuant to 42 U.S.C. § 1983, against the City of Newport News, Virginia, the former and current Newport News Chiefs of Police, James D. Fox and Richard W. Myers, respectively, and the four Newport News Police Officers involved in the shooting, Danielle Hollandsworth ("Hollandsworth"), Russel Tinsley ("Tinsley"), Randy Gibson ("Gibson"), and Ryan Norris ("Norris"). Hollandsworth and Gibson are the only Defendants remaining in this case, as the other Defendants were previously dismissed. ECF Nos. 33, 50, 67, 68.

Plaintiff alleged claims of excessive force, in violation of the Fourth and Fourteenth Amendments, against Hollandsworth and Gibson. Compl. at 12.  This matter comes before the Court on a Motion for Summary Judgment by Hollandsworth, ECF No. 59, and a Motion for Summary Judgment by Gibson (collectively "Defendants"), ECF No. 62. Defendants Hollandsworth and Gibson both assert that they did not violate Plaintiff's constitutional rights and they are entitled to qualified immunity for their actions on December 12, 2012, and urge the Court to grant summary judgment.  With the Motions fully briefed, and oral argument completed, this matter is ripe for consideration.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. Plaintiff's Prior Interactions with Law Enforcement

It is undisputed that, in 1999, prior to the incident giving rise to this suit, Plaintiff had been convicted of the felony offense of manufacture, sale, and possession of a controlled substance.  Br. in Supp. of Mot. for Summ. J., 3, ECF No. 63 [hereinafter "Mem. in Supp. of Gibson Mot."]; id., Ex. 6, Moody Deposition Excerpts, 68:3-15, ECF No. 63-6 [hereinafter "Moody Depo."].  It is also undisputed that Plaintiff sold narcotics to support himself between 2009 and 2012.  Moody Depo. at 22:11-14.

---

[1] As a general matter, the Court has described any genuinely disputed facts in a light most favorable to Plaintiff, the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

On March 11, 2012, Hollandsworth pulled Plaintiff over for a traffic stop in Newport News, Virginia.  Mem. in Supp. of Gibson Mot. at 3; id., Ex. 3, Hollandsworth Deposition Excerpts, 42:19-43:22, ECF No. 63-3 [hereinafter "Hollandsworth Depo."].  During this March 11, 2012 traffic stop, Plaintiff consented to a search of his person, and Hollandsworth discovered cocaine on Plaintiff.  Hollandsworth Depo. at 43:5-14.  Plaintiff was advised of his Miranda rights and was detained; Plaintiff then admitted to possession of the cocaine. Id.  Hollandsworth next searched Plaintiff's vehicle and located more narcotics.  Id. at 43:15-22.  Based upon the discovery of narcotics on Plaintiff's person and in his vehicle, Hollandsworth, and other police officers, obtained a search warrant for Plaintiff's residence.  Id.  During execution of the search warrant at Plaintiff's residence, Hollandsworth found, among other things, cocaine, ecstasy, several types of ammunition, and a firearm in rooms that were under Plaintiff's control.  Id. at 48:11-49:19.  Drug and weapon charges were later filed in the Hampton Circuit Court and Newport News Circuit Court related to the items found during the traffic stop and the search of Plaintiff's residence.  Id. at 43:19-25.  While the state charges were pending, Plaintiff was placed on bond.  See Transcript of Hearing on Mot. for Summ. J., 35:12-15, 47:19-23, ECF No. 94 [hereinafter "Transcript"]; Commonwealth v. Moody, CR12000671, Bond Order (Hampton, Va. Cir. Ct.).  Ultimately, federal authorities adopted the case,

prosecuting Plaintiff for possession of drugs with the intent to distribute, possessing a firearm in furtherance of such drug trafficking crime, and being a felon in possession of a firearm, and the Hampton and Newport News charges were dismissed as nolle prosequi. Id. at 60:3-15; Mem. in Supp. of Gibson Mot. at 4.

A valid federal arrest warrant was issued for Plaintiff, who was forty years old at the time, on November 15, 2012, based upon a three-count federal indictment for (1) possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1); (2) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); and (3) possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Mem. in Supp. of Gibson Mot. at 4; id., Ex. 4, Moody Indictment, ECF No. 63-4; id., Ex. 10, Moody Arrest Warrant, ECF No. 63-10.

At some point prior to December 12, 2012, Hollandsworth was informed of the federal charges pending against Plaintiff. Mem. in Supp. of Gibson Mot. at 4. According to Hollandsworth, Special Agent Tim Jenkins of the United States Drug Enforcement Agency advised her that a "federal detainer" had been issued against Plaintiff, and he requested her assistance in locating Plaintiff. Hollandsworth Depo. at 56:1-19, 60:12-15. Special Agent Jenkins also informed Hollandsworth of Plaintiff's last known whereabouts and the make, model, and license plate number of the car that Plaintiff was believed to be driving. Def. Hollandsworth's Mem. of Law in Supp. of Mot.

for Summ. J., Ex. 4, Hollandsworth's Answers to Plaintiff's First
Set of Interrogatories, 2, ECF No. 60-4 [hereinafter "Hollandsworth
Interrogatory Answers"].[2]   Hollandsworth looked for Plaintiff's
vehicle "over several months" in the area reported to her by Special
Agent Jenkins, and she located the vehicle known to be associated
with Plaintiff on December 12, 2012.  Id. at 2.

### B. December 12, 2012

On the evening of December 12, 2012, after locating the vehicle
known to be associated with Plaintiff, Hollandsworth, assisted by
Tinsley, undertook surveillance of the apartment where the vehicle
was located.  Hollandsworth Depo. at 75:22-77:7.  Hollandsworth and
Tinsley asked fellow Newport News police officers Norris and Gibson
for assistance with this surveillance.  Id. at 76:8-15.  During the
surveillance, Hollandsworth observed a blue BMW, which she knew to
have some relationship to Plaintiff, pull away from the apartment.
Id. at 79:8-16.  Hollandsworth and Tinsley suspected that Plaintiff
was driving the vehicle, and began to follow the blue BMW in their
unmarked police car.  Mem. in Supp. of Gibson Mot. at 4-5; id., Ex.
9, Tinsley Deposition Excerpts, 62:11-63:6, ECF No. 63-9
[hereinafter "Tinsley Depo."].  While Hollandsworth and Tinsley
followed the blue BMW, they observed the vehicle fail to signal a
lane change.  Tinsley Depo. at 64:3-18.  Hollandsworth and Tinsley

---

[2] Page numbers of Exhibits, except for deposition transcripts, correspond
to the page numbers assigned to Exhibits by the Court's electronic filing
system.

then activated the blue lights on their unmarked police vehicle and pulled over the blue BMW. Tinsley Depo. at 64:3-65:5. While pulling the vehicle over, Hollandsworth called in the traffic stop over the radio, notifying Gibson and Norris of the stop. Mem. in Supp. of Gibson Mot., Ex. 2, Gibson Deposition Excerpts, 28:7-29:4, ECF No. 63-2 [hereinafter "Gibson Depo."]; Tinsley Depo. at 64:10-18. Hollandsworth and Tinsley pulled the blue BMW over in the far left-hand lane, on an incline,[3] on the 35th Street overpass in Newport News, Virginia, near the on-ramps for Interstate 664 South and Interstate 664 North. Tinsley Depo. at 64:3-65:5; Gibson Depo. at 29:9-15. After the blue BMW stopped in the far left-hand lane, Tinsley and Hollandsworth parked their unmarked police car behind the BMW. Gibson Depo. at 29:9-15; Hollandsworth Depo. at 112:22-25. Gibson and Norris, who arrived with their blue lights activated at the scene shortly after Tinsley and Hollandsworth arrived, parked their unmarked police car behind Tinsley and Hollandsworth's vehicle.[4] Mem. in Supp. of Gibson Mot. at 5.

---

[3] Both sides represented to the Court during the May 5, 2016 hearing that Plaintiff's vehicle was parked on a slight incline, with the front of the vehicle being slightly higher than the rear of the vehicle. Transcript of Hearing on Mot. for Summ. J., 65:5-16, 84:1-12, ECF No. 94 [hereinafter "Transcript"]. Plaintiff's counsel further explained that, while the incline was slight, it was such that, should the vehicle have been in neutral and begun to roll, the vehicle would have rolled backwards. Id. at 84:1-12.

[4] During the May 5, 2016 hearing, both sides confirmed that the Gibson/Norris unmarked police car was parked behind both Plaintiff's vehicle and the Tinsley/Hollandsworth vehicle, and that all three vehicles were in a line in the far left-hand lane on 35th Street. Transcript at 36:13-23, 73:21-74:6.

After pulling the blue BMW over, Hollandsworth exited the police vehicle and approached the right (passenger) side of the vehicle. Tinsley Depo. at 68:4-14. Hollandsworth progressed far enough forward on the right side of the blue BMW to identify Plaintiff (who she knew from her earlier interactions with him) as the driver, and she informed Tinsley as much by giving Tinsley a thumbs up and confirming that "it's him." Id. After Hollandsworth identified Plaintiff, she returned to the rear of Plaintiff's vehicle—walking back the way that she had come—and circling around the back of Plaintiff's vehicle to eventually stand by the rear door on the left (driver) side. Id. at 68:8-15; Def. Hollandsworth's Mem. of Law in Supp. of Mot. for Summ. J., Ex. 1, Hollandsworth Deposition Excerpts, 86:5-8, 87:1-10, ECF No. 60-1 [hereinafter "Hollandsworth Mot. Depo."].

As Hollandsworth walked towards Plaintiff's vehicle, Tinsley exited the unmarked police car and approached the left (driver) side of Plaintiff's vehicle. Tinsley Depo. at 68:4-20. Tinsley continued to walk forward along the left side of Plaintiff's vehicle until he reached the front driver's side window. Id. at 68:13-69:9. However, as Tinsley neared Plaintiff's vehicle, he realized that he could not see Plaintiff's hands. Id. at 68:13-20. Tinsley then yelled and ordered Plaintiff to place his hands out the window, where

the officers could see them.[5]  Moody Depo. at 38:16-19; cf. Tinsley

Depo. at 68:13-20.   Plaintiff complied with Tinsley's order and

placed both hands out the window.  Moody Depo. at 38: 16-19; Tinsley

Depo. at 68:13-20.   Additionally, Plaintiff did not immediately

place his vehicle in park when he came to a stop on 35th Street; one

of the police officers told Plaintiff to take his foot off the brake

and put the vehicle in park.  Moody Depo. at 38:8-13.   Plaintiff

complied with the order and placed his vehicle in park.   Id. at

38:11-15.

     Gibson and Norris arrived at the scene shortly after Tinsley

and Hollandsworth arrived, just as Tinsley exited his police car.

Gibson Depo. at 29:9-19.  After arriving, Norris remained away from

Plaintiff's vehicle during the officers' interaction with Plaintiff.

Id. at 37:1-4; Hollandsworth Mot. Depo. at 86:15-87:4.   Gibson,

however, exited the unmarked police car and slowly walked towards

the right (passenger) side of Plaintiff's vehicle.  Gibson Depo. at

32:2-15.   Gibson continued to walk along the right side of

Plaintiff's vehicle until he reached the front right door.  Id. at

32:17-22.

---

[5] Plaintiff asserts that an officer told him to stick his hands out the
window, and he complied by rolling down the window and sticking his hands
out the window.   Moody Depo. at 38:16-19.   Tinsley recalls ordering
Plaintiff to put his hands on the steering wheel.   Tinsley Depo. at 68:4-20.
While the facts above comport with Plaintiff's version of the events, it
is immaterial whether Plaintiff placed his hands out the window or on the
steering wheel.   It is undisputed that, at this point in the interaction,
Plaintiff complied with Tinsley's order and placed his hands where the
officers could see them.

During the traffic stop, all four officers were wearing police raid vests, with the word "police" printed on them in yellow letters and a police badge on the front of the vest.[6]  Tinsley Depo. at 58:17-25; Hollandsworth Depo. at 84:17-85:4.  Further, both unmarked police vehicles were equipped with blue police lights, and such blue lights were activated on both cars during the traffic stop.[7] Mem. in Supp. of Gibson Mot. at 5; Hollandsworth Depo. at 112:5-113:2; Mem. in Supp. of Gibson Mot., Ex. 7, Norris Deposition Excerpts, 75:12-76:6, ECF No. 63-7 [hereinafter "Norris Depo."]; Moody Depo. at 37:7-21.  Due to the blue flashing lights, Plaintiff understood that the individuals pulling him over were police officers.  Moody Depo. at 37:19-38:7.

## C. Tinsley and Plaintiff's Struggle

Tinsley approached the left (driver) side of Plaintiff's vehicle, holding handcuffs in one hand.  Moody Depo. at 144:7-146:2, 157:7-17; Tinsley Depo. at 68:21-69:9.  When Tinsley reached the front driver's side door, he attempted to place the handcuffs on Plaintiff.  Moody Depo. at 144:2-6; Tinsley Depo. at 68:21-69:9.  While trying to place the handcuffs on Plaintiff, Tinsley grabbed

---

[6] At the May 5, 2016 hearing, Plaintiff's counsel confirmed that Tinsley, Hollandsworth, Gibson, and Norris were wearing police raid vests with identification over their plain clothes during the traffic stop on December 12, 2012.  Transcript at 84:14-17.

[7] At the May 5, 2016 hearing, Plaintiff's counsel confirmed that the blue lights were activated on both Tinsley and Hollandsworth's vehicle and Gibson and Norris' vehicle during the traffic stop on December 12, 2012. Transcript at 84:14-17.

Plaintiff's arm and attempted to pull Plaintiff towards himself, through the vehicle window.   Moody Depo. at 40:13-41:25, 144:2-146:2.  However, as Tinsley attempted to handcuff Plaintiff, Plaintiff "snatched" his hands back, away from Tinsley, and twisted to the right, towards the passenger seat of the vehicle.  Id. at 38:20-24, 48:18-25, 158:17:-159:6; Tinsley Depo. at 68:21-69:9; Hollandsworth Interrogatory Answers at 3.  After Plaintiff pulled back from Tinsley, he attempted to ask Tinsley "what's the problem . . . what's going on"?   Moody Depo. at 40:13-41:6. Tinsley's attempts to handcuff Plaintiff while he was still in the car were confusing to Plaintiff because, while he knew that Tinsley was a police officer, he had never been arrested or handcuffed in such a fashion.  Opp'n to Def. Gibson's Mot. for Summ. J., Ex. 2, Moody Deposition Excerpts, 46:21-48:4, ECF. No. 72-2 [hereinafter "Moody Opp'n Depo."].  Further, when Plaintiff pulled his arm away from Tinsley, he heard the officer standing by the passenger's side of the vehicle (Gibson) say "something about he was going to blow [Plaintiff's] head off or something like that."  Id. at 42:17-43:7.

As Plaintiff pulled away from Tinsley, Plaintiff drew his arms back towards himself and turned to his right, towards the passenger's seat.  Moody Depo. at 48:14-25.  Tinsley observed Plaintiff reach towards the center console area with both hands.  Tinsley Depo. at 69:6-9.  At that point, Tinsley attempted to gain control of Plaintiff's hands by reaching through the driver's side window.  Id.

at 69:10-21; Moody Depo. at 48:5-25.   In his attempt to grab Plaintiff's hands, Tinsley inserted the upper half of his body into Plaintiff's vehicle and ended up inside the car, through the driver's side window, from his waist up.[8]   Tinsley Depo. at 69:11-21; Moody Depo. at 53:5-13.  While attempting to control Plaintiff's hands, Tinsley also told Plaintiff to "stop reaching."   Def. Hollandsworth's Mem. of Law in Supp. of Mot. for Summ. J., 2, ECF No. 60; id., Ex. 2, Tinsley Deposition Excerpts, 78:13-24, ECF No. 60-2   [hereinafter   "Hollandsworth   Mot.   Tinsley   Depo."]; Hollandsworth Mot. Depo. at 87:11-14.

While Tinsley was inside Plaintiff's vehicle and attempting to grab his hands, Tinsley saw Plaintiff release the emergency brake on his vehicle.   Tinsley Depo. at 69:18-70:3.   Plaintiff then attempted to shift his car into gear.   Moody Depo. at 53:1-13, 57:1-19.   To shift his vehicle from park into drive, Plaintiff reached his hand to the right and down, between the driver and front

---

[8] As Plaintiff argues in his Opposition to Defendant Gibson's Motion for Summary Judgment, there is a dispute regarding the extent to which Tinsley's body was inside the passenger compartment of Plaintiff's vehicle.  Opp'n to Def. Gibson's Mot. for Summ. J., 2, ECF No. 72.  However, such dispute is not material.  Plaintiff and Tinsley agree that Tinsley's upper body was inside Plaintiff's vehicle.  Tinsley Depo. at 69:11-21; Moody Depo. at 53:5-13.  Hollandsworth observed Tinsley's hands inside Plaintiff's vehicle and a struggle.  Hollandsworth Depo. at 123:12-17.   Gibson observed that Tinsley's "body broke the threshold" of the vehicle to take control of Plaintiff's arm, but he observed Tinsley outside the vehicle at the "pillar post" between the front and rear driver side doors.  Gibson Depo. at 42:2-19, 45:7-18.  To the extent that Tinsley's location, as perceived by Hollandsworth or Gibson, affected Hollandsworth or Gibson's actions on December 12, 2012, such perceptions are individually addressed below.

passenger bucket seats. Moody Depo. at 53:18-55:18; Transcript at 95:16-21. While Plaintiff was reaching between the driver and front passenger seats, Plaintiff then heard a gunshot from one side of his vehicle and put his car in neutral. Moody Depo. at 53:1-4, 55:19-57:4. Plaintiff attempted to put his car into drive to escape the gunshot but he was only able to shift his car into neutral gear initially. Id. at 55:19-56:25. After Plaintiff put his car in neutral, he heard additional shots from the other side of his vehicle. Id. at 53:1-56:25. Plaintiff recalls that the gunshots came in short succession—with a very short time in between the first shot and those that followed from the other side of his vehicle. Id. at 56:1-25. Once Plaintiff shifted his vehicle into drive, his vehicle travelled forward, up the slight incline of the 35th Street overpass. Id. at 59:21-60:15. Tinsley was still in the passenger compartment of Plaintiff's vehicle when the car began to move.[9] Tinsley Depo. at

---

[9] Plaintiff asserts that there is an evidentiary dispute regarding whether Tinsley was still inside the passenger compartment of Plaintiff's vehicle when the car began to move. Opp'n to Def. Gibson's Mot. for Summ. J. at 3. However, a review of Plaintiff's deposition demonstrates that there is no material dispute regarding such fact. As noted above, Plaintiff, Tinsley, Hollandsworth, and Gibson agree that Tinsley's body was inside Plaintiff's vehicle, to some extent, before the car began to move. Supra n.8. There is no evidence that Tinsley moved away from Plaintiff's vehicle before it began to move. Instead, during Plaintiff's deposition, when he was asked if "the officer who had tried to handcuff [him] was still hanging in [his] passenger compartment up to the waist, from the window," Plaintiff replied: "I want to say he was still hanging in the car. I don't know that—did he fall back out of the car or not. I can't say, you know." Moody Depo. at 57:12-19. Further, to the extent that Hollandsworth or Gibson's perception of Tinsley's location differs from Plaintiff's recollection, such perception will be addressed below. Thus, there is no material dispute of fact regarding Tinsley's location when Plaintiff put the car in gear and began to move forward.

69:22-70:5; Def. Hollandsworth's Mem. of Law in Supp. of Mot. for Summ. J. at 3; id. Ex. 6, Norris Deposition Excerpts, 69:4-25, ECF No. 60-6 [hereinafter "Hollandsworth Mot. Norris Depo."]. Plaintiff's vehicle traveled forward a short distance before Tinsley heard a shot and felt a sensation "like somebody punched [him] in the side of the face." Tinsley Depo. at 70:1-5. Plaintiff's vehicle continued to travel forward across the 35th Street overpass, and it came to a stop on the other side of the overpass. Moody Depo. at 60:6-15. Plaintiff did not possess a weapon during the events on December 12, 2012. Opp'n to Def. Gibson's Mot. for Summ. J. at 4; see Hollandsworth Mot. Depo. at 92:10-93:8 (explaining that Hollandsworth did not see a weapon in Plaintiff's possession on December 12, 2012); cf. Def. Hollandsworth's Mem. of Law in Supp. of Mot. for Summ. J., Ex. 15, Certificate of Analysis, ECF No. 60-15 (listing forensic analysis test results of Hollandsworth and Gibson's weapons, the only two weapons fired at the scene on December 12, 2012).

### D. Hollandsworth's Actions

During Tinsley's interactions with Plaintiff, Hollandsworth stood behind Tinsley, along the left (driver) side of the vehicle, near the rear left door. Hollandsworth Mot. Depo. at 86:5-8. After Tinsley approached the front, driver side window, Hollandsworth watched Tinsley reach inside Plaintiff's vehicle with handcuffs and she observed the ensuing struggle between Tinsley and Plaintiff.

Id. at 123:4-125:2.   During the struggle, Hollandsworth saw Plaintiff's vehicle's brake lights flash[10] and Plaintiff reach downward, between the driver and front passenger seats, with his right hand.   Hollandsworth Interrogatory Answers at 3. Hollandsworth could not see fully into Plaintiff's vehicle, and she did not see a weapon from her vantage point.   Hollandsworth Mot. Depo. at 92:10-93:8.   However, having found a firearm in rooms under Plaintiff's control during her prior March 11, 2012 search of Plaintiff's residence, and therefore being concerned that Plaintiff might have a gun in his vehicle and might be reaching for such gun with his right hand, Hollandsworth took a step backwards and drew her weapon.   Id.   Hollandsworth "fear[ed] that Officer Tinsley would be shot," and she "fired [her] weapon once at the vehicle in an effort to protect Officer Tinsley."   Hollandsworth Interrogatory Answers at 3.   Hollandsworth fired one shot at the car.   Id.; Hollandsworth Mot. Depo. at 87:21-22.   After Hollandsworth fired her shot, she immediately heard Gibson fire his weapon.   Hollandsworth Interrogatory Answers at 3; Hollandsworth Depo. at 120:5-16. Hollandsworth's shot did not strike Plaintiff, but traveled through the left rear side window, behind the driver's seat, through the driver's headrest and penetrated the dashboard.   Def.

---

[10] Norris also observed Plaintiff's vehicle's brake lights illuminate. Hollandsworth Mot. Norris Depo. at 69:1-2.   However, due to the limited amount of Norris' deposition testimony provided by the parties, it is unclear whether Norris and Hollandsworth observed Plaintiff's brake lights illuminate for the same amount of time.

Hollandsworth's Mem. of Law in Supp. of Mot. for Summ. J. at 4; id.,
Ex. 7, Criminal Investigation, 5, ECF No. 60-7; id., Ex. 9, Best
Deposition Excerpts, 50:10-22, ECF No. 60-9.

### E. Gibson's Actions

When Gibson arrived at the scene, he exited his unmarked police
car and approached the right (passenger) side of Plaintiff's vehicle.
Gibson Depo. at 32:4-25. Gibson walked along the right side of
Plaintiff's vehicle until he reached the front of the vehicle, near
the front passenger side door. Id. Once Gibson reached the front
passenger side door, he observed Tinsley, standing alongside the left
driver side of Plaintiff's vehicle, reach inside Plaintiff's vehicle
to take control of Plaintiff's left arm. Def. Hollandsworth's Mem.
of Law in Supp. of Mot. for Summ. J., Ex. 3, Gibson Deposition
Excerpts, 37:11-39:8, ECF No. 60-3 [hereinafter "Hollandsworth Mot.
Gibson Depo."]. Gibson saw Tinsley's body break the threshold of
Plaintiff's vehicle window, but he does not recall whether Tinsley's
chest, head, or upper torso, were in the proximity of Plaintiff's
steering wheel. Gibson Depo. at 42:2-19. While Tinsley was
attempting to take control of Plaintiff's arm, Gibson observed
Plaintiff reach down, place his hand on his vehicle's emergency
brake, and lower the emergency brake. Hollandsworth Mot. Gibson
Depo. at 37:11-38:23. As Gibson realized the Plaintiff was lowering
the emergency brake, he yelled at Plaintiff to stop. Id. at 39:9-15.
When Plaintiff continued to lower the emergency brake and began to

move to put his vehicle into gear, Gibson began drawing his firearm. Id. at 40:6-25.  As Gibson drew his weapon, he observed Tinsley "going forward and downward" as if "being drug by the car."[11]  Gibson Depo. at 44:1-4, 45:7-18.  Gibson believed that Plaintiff was about to flee and that Tinsley was in danger of being dragged or run over during Plaintiff's flight, so he fired his weapon at Plaintiff.  Mem. in Supp. of Gibson Mot. at 8; id., Ex. 1, Gibson Interrogatory Answers, 2, ECF No. 63-1.

When he began to shoot, Gibson stood alongside the front right (passenger) side door and his first shot went through the front right side window, towards Plaintiff's legs.  Gibson Depo. at 44:17-45:6. At about the time Gibson shot, he heard another gunshot, which he believed to have come from another officer.   Id. at 44:5-16. Gibson's next shots, towards Plaintiff's upper body, traversed along the right side of the vehicle as the vehicle moved forward away from Gibson.  Id. at 45:7-25, 48:7-18; Def. Hollandsworth's Mem. of Law in Supp. of Mot. for Summ. J., Ex. 8, NNPD Photographs, ECF No. 60-8.

---

[11] Plaintiff argues that there is a material dispute of fact between Plaintiff and Defendants' evidence because, he asserts, Gibson shot at Plaintiff before Plaintiff's vehicle began to move forward.  Opp'n to Def. Gibson's Mot. for Summ. J. at 3.  Plaintiff argues that, to the extent Gibson shot before Plaintiff's vehicle began to move forward, Gibson's perception that Tinsley was being dragged was unreasonable.  Id. at 7. However, as addressed later, such dispute is not material because Gibson's undisputed perception of Tinsley's movement "forward and downward," whether or not such movement was related to the movement of Plaintiff's vehicle, combined with his observation of Plaintiff's motions to shift his vehicle into drive, are sufficient to support his reasonable perception that Tinsley was in danger as a result of Plaintiff's ongoing actions.

Gibson fired approximately four shots at Plaintiff through the windows of Plaintiff's vehicle.  Gibson Depo. at 48:19-49:20. Plaintiff suffered gunshot wounds and sustained permanent injuries resulting from the transection of his spinal cord at the T10-T11 level.  Opp'n to Def. Hollandsworth's Mot. for Summ. J., Ex. 4, Waller Report, ECF No. 64-4.

### F. Procedural History

On July 31, 2014, Plaintiff filed suit, pursuant to 42 U.S.C. § 1983, against the City of Newport News, Richard Myers (the current Newport News Chief of Police), James Fox (the former Newport News Chief of Police), and Norris, Hollandsworth, Tinsley, and Gibson. Compl., ECF No. 1.  Plaintiff asserted several claims, including claims of unreasonable seizure through use of excessive force, in violation of the Fourth and Fourteenth Amendments, against the four police officers.  Id.  Claims against Richard Meyers and James Fox were dismissed on November 4, 2014.  ECF Nos. 33, 44.  The parties stipulated to dismissal of Plaintiff's claims against Norris on September 11, 2015.  ECF No. 50.  Further, the parties stipulated to the dismissal of the City of Newport News and Tinsley on December 28, 2015.  ECF Nos. 67, 68.  Thus, the only parties remaining in this action are Hollandsworth and Gibson.

On December 7, 2015, Hollandsworth filed her Motion for Summary Judgment, arguing that she did not violate Plaintiff's constitutional rights because her actions on December 12, 2012 did

not seize Plaintiff, that her actions did not constitute excessive force, and that she is entitled to qualified immunity.[12]   Def. Hollandsworth's Mot. for Summ. J., ECF No. 59.   On December 21, 2015, Plaintiff filed his opposition to Hollandsworth's Motion.   Opp'n to Def. Hollandsworth's Mot. for Summ. J., ECF No. 64.   Hollandsworth filed her reply in support of her Motion on December 23, 2015.   Def. Hollandsworth's Reply to Opp'n to Mot. for Summ. J., ECF No. 65.

On December 21, 2015, Gibson filed his Motion for Summary Judgment, arguing that his actions did not constitute excessive force and that he is entitled to qualified immunity.   Mot. for Summ. J., ECF No. 62.   On January 11, 2016, Plaintiff filed his opposition to Gibson's motion.   Opp'n to Def. Gibson's Mot. for Summ. J., ECF. No. 72.   Gibson filed his reply in support of his Motion on January 19, 2016.   Reply Br. in Supp. of Mot. for Summ. J., ECF No. 80.   The parties then appeared before the Court for extensive oral argument on May 5, 2016.

---

[12] Hollandsworth also argues that she is not liable for a claim of bystander liability.   Mem. in Support of Hollandsworth Mot. at 6-9.   In response to Hollandsworth's arguments, and evidence developed during deposition and discovery, Plaintiff withdrew his claims of bystander liability in his Opposition to Hollandsworth's Motion for Summary Judgment.   Opp'n to Def. Hollandsworth's Mot. for Summ. J. at 9.   Further, Plaintiff's counsel confirmed during the May 5, 2016 hearing that Plaintiff is not pursuing any claims related to bystander liability or substantive due process against Hollandsworth or Gibson in this matter.   Transcript at 104:25-105:23.

## II. LEGAL STANDARD

### A. Summary Judgment Standard

The Federal Rules of Civil Procedure provide that a district court shall grant summary judgment in favor of a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 332 (4th Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A fact is "material" if it "might affect the outcome of the suit," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. A party opposing a summary judgment motion "'cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.'" Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

Federal Rule of Civil Procedure 56(c) addresses the applicable procedure for pursuing, and defending against, summary judgment, explaining as follows:

**(c) Procedures.**

(1) *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed <u>must support the assertion by</u>:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(emphasis added). Rule 56 further states that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court has discretion to "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

Although the initial burden at summary judgment falls on the moving party, once such party has advanced evidence supporting entry of summary judgment, the non-moving party may not rest upon the mere allegations of the pleadings, but instead must set forth specific facts in the form of exhibits, sworn statements, or other materials that illustrate a genuine issue for trial. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–24 (1986); <u>Butler v. Drive Auto. Indus. of Am., Inc.</u>, 793 F.3d 404, 408 (4th Cir. 2015). Thus, while the movant must carry the burden to show the absence of a genuine issue of material fact, when such burden is met, the non-movant must establish the existence of such an issue. <u>Celotex</u>, 477 U.S. at 322–

23. At that point, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. In doing so, the judge must construe the facts and all "justifiable inferences" in the light most favorable to the non-moving party, and the judge may not make credibility determinations. Id. at 255; Jones v. Chandrasuwan, ___ F.3d ___, No. 15-1110, 2016 WL 1697682, at *3 (4th Cir. Apr. 28, 2016).

### B. Qualified Immunity

Defendants Hollandsworth and Gibson assert that they did not violate Plaintiff's constitutional rights and that they are entitled to qualified immunity for their actions on December 12, 2012. Because the determination of whether Defendants violated Plaintiff's constitutional rights is a component of the qualified immunity analysis, the Court analyzes both arguments under the rubric of its qualified immunity analysis below.[13]

"'Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 898 (4th Cir. 2016) (quoting Henry v. Purnell, 652 F.3d 524,

---

[13] During the May 5, 2016 hearing, each party confirmed that the determination of whether Defendants violated Plaintiff's constitutional rights is coterminous with the Court's determination regarding the first step of the qualified immunity analysis. Transcript at 11:16-23, 17:17-18:5, 53:24-54:2.

531 (4th Cir. 2011) (en banc)).  This protection "'balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'"  Yates v. Terry, 817 F.3d 877, 884 (4th Cir. 2016) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009).  To determine whether an officer is entitled to qualified immunity, courts engage in a two-step inquiry.  "The first step is to determine whether the facts, taken in the light most favorable to the non-movant, establish that the officer violated a constitutional right.  At the second step, courts determine whether that right was clearly established."  Id. (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).

As to the first step of the qualified immunity analysis, in the present case, the Complaint alleges that the Newport News Police Officers violated Plaintiff's constitutional right to be free of unreasonable seizure accomplished by the use of excessive force.  "The Fourth Amendment bars police officers from using excessive force to effectuate a seizure."  Yates, 817 F.3d at 884 (citing Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003)); see Graham v. Connor, 490 U.S. 386, 395 (1989).  A "claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of [a] person" is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard."

Armstrong, 810 F.3d at 899 (quoting Graham, 490 U.S. at 388).   An
officer may employ force, when such force is reasonable under the
circumstances, in the course of his or her duty.   Further, a
reasonable officer may use deadly force "[w]here the officer has
probable cause to believe that [a] suspect poses a threat of serious
physical harm, either to the officer or to others."   Tennessee v.
Garner, 471 U.S. 1, 11 (1985).

     In determining whether force is reasonable, courts are required
to carefully balance "'the nature and quality of the intrusion on
the   individual's   Fourth   Amendment   interests'   against   the
countervailing governmental interests at stake."   Graham, 490 U.S.
at 396 (quoting Garner, 471 U.S. at 8).   To accomplish such
balancing, a court "focus[es] on the facts and circumstances of each
case, taking into account '[1] the severity of the crime at issue,
[2] whether the suspect poses an immediate threat to the safety of
the officers or others, and [3] whether he is actively resisting
arrest or attempting to evade arrest by flight.'"   Yates, 817 F.3d
at 885 (quoting Graham, 490 U.S. at 396); Armstrong, 810 F.3d at 899.
A court must consider the reasonableness of the force employed "'in
full context, with an eye toward the proportionality of the force
in light of all the circumstances.'"   Smith v. Ray, 781 F.3d 95, 101
(4th Cir. 2015) (quoting Waterman v. Batton, 393 F.3d 471, 481 (4th
Cir. 2005)).   The Court of Appeals for the Fourth Circuit has
recognized   that   "'police   officers   are   often   forced   to   make

split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—[and] we take care to consider the facts from the perspective of a reasonable officer on the scene, and avoid judging the officer's conduct with the 20/20 vision of hindsight.'" Cooper v. Sheehan, 735 F.3d 153, 158-59 (4th Cir. 2013) (quoting Clem v. Corbeau, 284 F.3d 543, 550 (4th Cir. 2002)).

The second step of the qualified immunity analysis—the "clearly established" prong—is "a test that focuses on the objective legal reasonableness of an official's acts." Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he [wa]s doing violates that right.'" Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)). Ordinarily, to determine whether a right is clearly established in this circuit, the court "'need not look beyond the decisions of the Supreme Court, [the Fourth Circuit] court of appeals, and the highest court of the state in which the case arose' to determine whether a reasonable officer would know that his conduct was unlawful in the situation he confronted." Yates, 817 F.3d at 887 (quoting Wilson v. Kittoe, 337 F.3d 392, 402-03 (4th Cir. 2003)); Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999). An official violates a clearly established constitutional right when, "'in the light of preexisting law[,] the unlawfulness' of the actions is apparent." Iko v. Shreve, 535 F.3d

225, 237-38 (4th Cir. 2008) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).   The "clearly established" inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (quoting Saucier, 533 U.S. at 201).   There need not be a case "directly on point" in order for an officer to know that his or her conduct violates a clearly established right, "but existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011) (citing Anderson, 483 U.S. at 640; Malley v. Briggs, 475 U.S. 335, 341 (1986)).

### III. DISCUSSION

As noted above, Plaintiff has alleged that Hollandsworth and Gibson each engaged in an unreasonable seizure by using excessive force against Plaintiff, in violation of the Fourth and Fourteenth Amendments, during the events that transpired on December 12, 2012. Both Hollandsworth and Gibson seek summary judgment on Plaintiff's claim against them, arguing that they did not violate Plaintiff's constitutional rights and that they are entitled to qualified immunity.

### A. Hollandsworth's Motion for Summary Judgment

Hollandsworth asserts, first, that Plaintiff's excessive force claim fails because, while Hollandsworth fired her weapon at Plaintiff on December 12, 2012, her shot did not strike Plaintiff.

Thus, as a matter of law, Hollandsworth argues, she did not "seize" Plaintiff and she cannot be held liable for unreasonable seizure by means of excessive force.   Second, Hollandsworth asserts that she is entitled to qualified immunity because she did not engage in excessive force during the events that took place on December 12th. Instead, Hollandsworth argues, she acted based upon a "reasonabl[e] [perception] that Tinsley was in serious danger."   Mem. in Supp. of Hollandsworth's Mot. at 11.   Additionally, even if she used excessive force against Plaintiff, Hollandsworth asserts that she is entitled to qualified immunity because she did not violate a clearly established constitutional right.

In response, Plaintiff argues that Hollandsworth affected a seizure of Plaintiff because she "was the first party to fire her weapon and such triggered the events that led to this incident." Pl.'s Opp'n to Hollandsworth's Mot. for Summ. J. at 4.   Plaintiff also argues that qualified immunity is not warranted because, in light of the "full context" of the incident, "a reasonable officer would not have believed the conduct was lawful and would not have utilized the force employed by Defendant Hollandsworth."   Id. at 9. The Court will address each of Hollandsworth's arguments in turn.

## 1. Unreasonable Seizure

Hollandsworth first argues that her actions on December 12, 2012 did not constitute a seizure of Plaintiff.   The Court begins its consideration of this issue by looking at the definition of

"seizure."   "[T]he word 'seizure' [means] a 'taking possession [of]' . . . [and f]or most purposes at common law, the word connoted not merely grasping, or applying physical force to, the animate or inanimate object in question, but actually bringing it within physical control."   California v. Hodari D., 499 U.S. 621, 624 (1991) (internal citations omitted).   The United States Supreme Court has recognized two circumstances that may constitute an arrest, and therefore a seizure, under the Fourth Amendment.   Id.

> First, the [Supreme Court] concluded that a person is
> "seized" if he is touched by a police officer with lawful
> authority and purpose to arrest, even if that person is
> not subdued. . . .   Second, following [the Supreme
> Court's] decision in Terry v. Ohio, 392 U.S. 1, 19 n.16
> (1968), the Court also concluded that a person is "seized"
> under the Fourth Amendment upon the submission of that
> person to an official "show of authority."

United States v. Letsinger, 93 F.3d 140, 143 (4th Cir. 1996) (citing Hodari D., 499 U.S. at 626-29).   Where "physical force is absent, a seizure requires both a 'show of authority' from law enforcement officers and 'submission to the assertion of authority' by the [individual]."   United States v. Stover, 808 F.3d 991, 995 (4th Cir. 2015) (quoting Hodari D., 499 U.S. at 626).

Applying this standard to a similar set of facts, our Court of Appeals, in the unpublished decision of Estate of Rodgers ex rel. Rodgers v. Smith, 188 F. App'x 175 (4th Cir. 2006), rejected an unreasonable seizure claim against a police officer.   Id. at 180 (citing Hodari D., 499 U.S. at 625-26; Letsinger, 93 F.3d at 143).

In Rodgers, a police officer fired his weapon at the plaintiff, who refused to submit to law enforcement's show of authority, but the officer's shot did not strike the plaintiff.  Id. at 179.  The Fourth Circuit held that, because the plaintiff did not submit to law enforcement's show of authority and, alternatively, "because the bullets from [the officer's] weapon never touched [the plaintiff]," the officer did not seize the plaintiff under either circumstance described above.  Id. at 180-81 (citing Carr v. Tatangelo, 338 F.3d 1259, 1267, 1270-71 (11th Cir. 2003)).  Similar to the Fourth Circuit's analysis on this issue, other courts have concluded that no seizure took place when a plaintiff failed to submit to an officer's show of authority and the officer shot at the plaintiff and missed.  See Jones v. Norton, 3 F. Supp. 3d 1170, 1190 (D. Utah 2014), aff'd, 809 F.3d 564 (10th Cir. 2015) ("Because Mr. Murray resisted Detective Norton's order and because Detective Norton's bullets missed the target (Mr. Murray), Detective Norton did not seize Mr. Murray at that point." (citing James v. Chavez, 830 F. Supp. 2d 1208, 1242-43 (D.N.M. 2011))); James v. Chavez, 830 F. Supp. 2d 1208, 1242-44 (D.N.M. 2011), aff'd, 511 F. App'x 742 (10th Cir. 2013) (finding that a seizure did not occur because the officer did not hit the plaintiff with his bullet and there was no evidence that the plaintiff had submitted to a show of authority); Graham v. Pa. State Police Lancaster Cty., No. 09-3106, 2009 WL 3682384, at *3 (E.D. Pa. Nov. 3, 2009) (unpublished) ("Although a seizure by physical force

can occur when a police officer actually shoots a suspect, see, e.g., Tennessee v. Garner, 471 U.S. 1, 7 (1985), firing a shot that misses a suspect does not constitute a seizure by physical force." (citing Plaza-Bonilla v. Cortazzo, No. 07-2045, 2009 WL 605909, *4 (E.D. Pa. March 9, 2009); Manelski v. Tinicum Twp., No. 07-1487, 2008 WL 5250691, at *2 (E.D. Pa. Dec. 17, 2008))); Shaw v. Goodrich, No. 1:05cv003, 2005 WL 2348473, at *2 (S.D. Ind. Sept. 26, 2005) (listing cases that have concluded that "no seizure took place where the officers' shots neither struck nor stopped the plaintiff"); cf. Carr, 338 F.3d at 1270-71 (explaining that, because the plaintiff was not shot or physically touched by the officers, his excessive force claim related to a shooting is based on substantive due process under the Fourteenth Amendment, rather than the Fourth Amendment's protections against unreasonable seizures).

In the present case, there is no dispute that Hollandsworth's shot did not strike Plaintiff. Further, the undisputed evidence demonstrates that, at the time Hollandsworth shot, Plaintiff was resisting multiple efforts to show authority by the officers.[14] As

---

[14] During the May 5, 2016 hearing, Plaintiff argued that he, in fact, did submit to the officers' show of authority because he initially complied with the officers' directions to place his hands where they could see them and to place his vehicle in park. Transcript at 12:6-13:7. Relying on the Fourth Circuit's opinion in United States v. Stover, 808 F.3d 991 (4th Cir. 2015), Plaintiff argued that the officers made a show of authority and Plaintiff initially submitted to that show of authority, and, thus, despite his later attempts to resist handcuffing and to drive away, a seizure was effectuated in this case. Id. at 13:11-14:12. Plaintiff's argument, however, is unavailing. The Stover decision does not support Plaintiff's assertion that the legal implications of his initial compliance

such, the Court finds the Rodgers case persuasive, and concludes that Hollandsworth did not affect an unreasonable seizure of Plaintiff because Hollandsworth did not seize Plaintiff at all.

Plaintiff attempts to differentiate the present case from the holding in Rodgers by arguing that Hollandsworth effectively caused a seizure of Plaintiff because she "was the first party to fire her weapon and such triggered the events" on December 12th. Opp'n to Def. Hollandsworth's Mot. for Summ. J. at 4. Plaintiff bases his argument on the unpublished case of Newsome v. Watson, No. 2:14cv94, 2014 WL 4202480 (E.D. Va. Aug. 22, 2014), in which the court denied a motion to dismiss, finding that the plaintiff adequately pled that the officer, who did not personally employ excessive force, effectively caused excessive force to be exerted against the

_____

continue after he stopped complying and began to resist arrest. Instead, Stover held that, while it was initially unclear whether the defendant submitted to the officers' commands, his subsequent disobedience to the officers' instructions demonstrated that the defendant did not submit to the show of police authority and, thus, a seizure was not effectuated until the individual completely complied with police commands. Stover, 808 F.3d at 1000-01. Further, in Hodari D., the Supreme Court explained that, even though an arrest may have been effectuated, it does not mean that, "for Fourth Amendment purposes[,] there is a continuing arrest during [a] period of fugitivity." Hodari D., 499 U.S. at 625(citing Thompson v. Whitman, 85 U.S. 457, 471 (1874)). Instead, Hodari D. notes that even if a seizure was initially effectuated, such seizure does not continue throughout a subsequent pursuit or resistance. Id.; see United States v. Griffin, 652 F.3d 793, 799 (7th Cir. 2011) (rejecting a "seizure-as-a-continuum" theory); Farm Labor Org. Comm. v. Ohio State Highway Patrol, 308 F.3d 523, 548 (6th Cir. 2002) ("Hodari D. merely explained that if a suspect flees after an initial seizure, the seizure does not continue throughout the subsequent pursuit."). Therefore, the officers' show of authority and Plaintiff's initial show of submission did not effectuate a seizure in this matter, because Plaintiff subsequently disobeyed police commands and resisted arrest.

plaintiff.  Id. at *5.  However, the parties in Newsome did not
dispute that a seizure took place, and the Newsome court did not
address whether the officer, who did not employ excessive force,
effectuated a seizure.  Id. at *3.  Thus, Plaintiff's reliance on
Newsome to argue that a seizure took place in the present case is
misplaced because, for purposes of the Fourth Amendment analysis,
the only issue that the Newsome court considered was whether the
officers' conduct was reasonable.

Further, even if this Court were to consider Plaintiff's
"effective causation" theory, an unpublished opinion from our Court
of Appeals has explained that such theory is "highly dubious in the
excessive force context."  Gandy v. Robey, 520 F. App'x 134, 142 (4th
Cir. 2013) (unpublished).  This is so because, "[a] police officer's
pre-seizure conduct, regardless of whether it was ill-advised or
violative of law enforcement protocol, is generally not relevant for
purposes of an excessive force claim under the Fourth Amendment which
looks only to the moment force is used."  Id. (citing Greenidge v.
Ruffin, 927 F.2d 789, 791 (4th Cir. 1991)).  Thus, to the extent that
Hollandsworth's shot did not seize Plaintiff, Hollandsworth's
conduct is generally not relevant in determining whether excessive
force was used by other officers.  Therefore, Plaintiff's theory of
"effective causation" is not sufficient to demonstrate that
Hollandsworth seized Plaintiff on December 12, 2012, much less that
such seizure was unreasonable.

## 2. Qualified Immunity

Alternatively, even if Hollandsworth's conduct effected a seizure, the undisputed evidence indicates that Hollandsworth is entitled to qualified immunity for her use of force.  Hollandsworth is entitled to qualified immunity, on the first step of the qualified immunity analysis, because the undisputed evidence demonstrates that she did not violate a constitutional right of Plaintiff.  As to the second step of the qualified immunity analysis, Hollandsworth is entitled to qualified immunity because, even if her conduct on December 12th violated a constitutional right, such right was not clearly established.

### a. Constitutional Violation—Excessive Force

In determining whether an officer's use of force is objectively reasonable, the focus "is on what the police officer reasonably perceived at the time that he acted and whether a reasonable officer armed with the same information, would have had the same perception and have acted in like fashion." Lee v. City of Richmond, 100 F. Supp. 3d 528, 541 (E.D. Va. 2015) (citing Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994)); see Cooper, 735 F.3d at 158-59 (explaining that a "reasonable officer" inquiry includes considering that "'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving'" (quoting Clem, 284 F.3d at 550)).  To determine whether an officer's use of force is objectively reasonable, a court should consider,

"'[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [a plaintiff] is actively resisting arrest or attempting to evade arrest by flight.'"[15]  Yates, 817 F.3d at 885 (quoting Graham, 490 U.S. at 396).  Considering these factors, Hollandsworth's conduct was objectively reasonable because another officer, armed with the same information that Hollandsworth had, would have perceived that Tinsley was in danger and would have acted to protect Tinsley.

With respect to the first factor, determination of the "severity of the crime at issue" includes consideration of the possible serious impending criminal activity that Hollandsworth reasonably perceived, in addition to crimes that have already taken place.[16]  See

---

[15] In his Opposition, Plaintiff also argues that the Court should consider the extent of his injuries in determining whether Hollandsworth's conduct was reasonable.  Opp'n to Def. Hollandsworth's Mot. for Summ. J. at 8-9.  Plaintiff is correct that our Court of Appeals has found that "the extent of the plaintiff's injury is also a relevant consideration" in determining whether excessive force was used.  Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003).  However, such consideration is of limited relevance in the present matter because the Court must determine whether, based on the circumstances, Hollandsworth's use of her firearm on December 12th constituted excessive force.  However, while Plaintiff's injuries are severe and would be relevant to a determination of other matters, the extent of Plaintiff's injuries does not affect the Court's determination of whether Hollandsworth's use of her weapon was unreasonable because, if the Court determines that Hollandsworth's use of her weapon was unreasonable, any injury suffered by Plaintiff would be the result of excessive force.

[16] During the May 5, 2016 hearing, the parties agreed that, in considering the "severity of the crime at issue," the Court should consider, not only the offenses with which Plaintiff was charged in the federal indictment, but also the criminal activity which the officers reasonably perceived at the time they shot.  Transcript at 54:15-55:20, 103:12-104:11.

Anderson v. Russell, 247 F.3d 125, 132 (4th Cir. 2001) (finding that an officer's decision to shoot was reasonable because the "crime at issue" was not limited to the "possible violation of Maryland's concealed weapons law," but included the officer's concern that the individual intended "to use the concealed weapon in a way that would put himself, the mall patrons, or other citizens in jeopardy"). On December 12th, the officers sought to arrest Plaintiff on an outstanding federal warrant for drug and weapon charges. During the arrest, Plaintiff disobeyed the officers' instructions, resisted arrest, and reached for, what Hollandsworth thought to be, a weapon to use to escape arrest. Hollandsworth believed, based on her previous interactions with Plaintiff, and having previously found a firearm in rooms under Plaintiff's control, as well as Plaintiff's active resistance to arrest, that Plaintiff possessed a weapon. Further, as Plaintiff was struggling with Tinsley to avoid being handcuffed, Hollandsworth believed that Plaintiff intended to use a concealed weapon to harm Tinsley. Thus, the "crime[s] at issue" in this matter are severe and include Plaintiff's outstanding drug and weapon charges, any charges related to Plaintiff's resistance to arrest, and potential charges for the harm that Hollandsworth perceived that Plaintiff would cause to Tinsley.

With respect to the second factor, whether the suspect poses an immediate threat to the safety of the officers or others, Plaintiff argues that Hollandsworth's belief that he posed an immediate threat

to Tinsley's safety is unreasonable because he did not possess a
firearm and, thus, could not have shot anyone.   Opp'n to Def.
Hollandsworth's Mot. for Summ. J. at 8.   Plaintiff's argument,
however, is unavailing because Hollandsworth reasonably perceived
that Plaintiff was reaching for a firearm and that, if he obtained
a firearm, he posed an immediate threat to Tinsley's safety.   Our
Court of Appeals has held that, when faced with a threat of serious
physical harm, either to the officer or to others, "an officer is
not required to see an object in the suspect's hand before using
deadly force."   Anderson, 247 F.3d at 131.   Instead, an officer may
use such force if it is based on the perception that an individual
is armed and presents a threat of serious physical harm, even if the
belief that the individual is armed is mistaken.   See id. (finding
that an officer acted reasonably in firing on an individual as a
protective measure when the officer believed the individual to be
reaching for a weapon in his waistband, even when such belief was
mistaken).    In  the  present  case,  the  undisputed  evidence
demonstrates that seconds before Hollandsworth fired her weapon, she
observed Tinsley struggling to gain control of Plaintiff's hands and
she saw Plaintiff reach in a direction away from Tinsley and down
towards the floorboards of his vehicle.   Although Hollandsworth did
not see a weapon in Plaintiff's possession, she knew of Plaintiff's
prior gun possession, and drug and weapon charges, and feared that
Plaintiff was reaching for a firearm.   Further, Hollandsworth

perceived that, should Plaintiff succeed in any attempt to pick up a firearm, Tinsley was in danger of serious harm. Thus, even though Hollandsworth was mistaken in her belief that Plaintiff had a firearm during the events on December 12, 2012, Hollandsworth had sound reasons for her perception that Plaintiff posed an immediate threat to Tinsley's safety at the time she shot.

Finally, with respect to the third factor, whether a plaintiff is actively resisting arrest or attempting to evade arrest by flight, Plaintiff argues that Hollandsworth's perception that he resisted arrest is unreasonable because, based on Cowles v. Peterson, 344 F. Supp. 2d 472 (E.D. Va. 2004), the officers caused Plaintiff to resist arrest by "refusing to provide him with information as to why he was being stopped and handcuffed." Opp'n to Def. Hollandsworth's Mot. for Summ. J. at 8; Transcript at 26:19-27:24. The Cowles decision is factually distinct from the instant case, and Plaintiff's argument is not supported by the evidence. The Cowles court determined that, considering the totality of the circumstances, the officer's use of force against a non-compliant plaintiff was not reasonable because, prior to the plaintiff's attempted flight or resistance, the officer used excessive force by striking the plaintiff on the forehead twice with a can of mace, which arguably prompted the plaintiff's flight. Cowles, 344 F. Supp. 2d at 482-83. Conversely, in the present case, the officers did not employ, and Plaintiff does not assert that the officers employed, excessive force before he began to resist arrest.

36

Plaintiff has admitted that he understood that he was being pulled over by police officers at the time of his interaction with Tinsley. When Tinsley attempted to place handcuffs on Plaintiff, Plaintiff stated that he "snatched" his hands back and turned away from Tinsley before asking any questions of the officers. Plaintiff continued to struggle with Tinsley, and to resist Tinsley's attempts to handcuff him, even after Tinsley told Plaintiff to "stop reaching." Additionally, Plaintiff does not assert an excessive force claim against Tinsley, or any other officer, based on the events that preceded Hollandsworth's shot. [17]  Thus, Plaintiff has not demonstrated that Tinsley, or another officer, instigated his resistance to arrest. Moreover, Hollandsworth reasonably perceived that Plaintiff was actively resisting arrest at the time she shot.

Therefore, Hollandsworth did not use excessive force against Plaintiff. Considering the factors discussed in Yates, Hollandsworth's conduct was objectively reasonable because she perceived that Plaintiff, while actively resisting arrest, reached for a weapon, intending to harm Tinsley. Another officer, armed with the same information that Hollandsworth had, would have perceived that Tinsley was in danger and would have acted similarly to protect Tinsley.

---

[17] During the May 5, 2016 hearing, Plaintiff's counsel confirmed that the only activities that Plaintiff alleges constitute excessive force in this matter are the shots fired by Hollandsworth and Gibson. Transcript at 32:17-33:9, 105:19-24.

### b. Clearly Established

Further, even if Hollandsworth used excessive force, she would still be entitled to qualified immunity because she did not violate a clearly established constitutional right.  As noted above, "[a] clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he [wa]s doing violates that right.'"  Mullenix, 136 S. Ct. at 308 (2015).  The "'salient question'" in determining whether a rule is clearly established "'is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'"  Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

At the time of the events in question, the state of the law did not provide Hollandsworth with fair warning that her conduct was unconstitutional.  Instead, at the time of the incident, the state of the law made allowances for officers like Hollandsworth, who made a split-second decision to fire her weapon, believing that a fellow officer was in danger.

> Before employing deadly force, police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others. Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm—the Constitution does not require that certitude precede the act of self protection.

Elliott v. Leavitt, 99 F.3d 640, 644 (4th Cir. 1996).   Further, even though Hollandsworth was mistaken as to the presence of a gun and the corresponding extent of the threat posed by Plaintiff, our Court of Appeals has held that an officer's actions are reasonable when such officer fires a weapon based on a well-founded, though mistaken, belief that a suspect is reaching for a gun.   See Anderson, 247 F.3d at 132 (citing Elliott, 99 F.3d at 644; Reese v. Anderson, 926 F.2d 494, 501 (5th Cir. 1991)); McLenagan v. Karnes, 27 F.3d 1002, 1007-08 (4th Cir. 1994) ("We will not second-guess the split-second judgment of a trained police officer merely because that judgment turns out to be mistaken, particularly where inaction could have resulted in death or serious injury to the officer and others.").   Thus, Hollandsworth did not violate a clearly established constitutional right when she fired her weapon at Plaintiff.

Therefore, as an alternative holding to the Court's ruling that Hollandsworth did not seize Plaintiff, the Court also finds that Hollandsworth is entitled to qualified immunity for her conduct on December 12, 2012 because she did not violate a clearly established constitutional right.   As such, Hollandsworth's Motion for Summary Judgment is **GRANTED** on two separate grounds and she is **DISMISSED** from this action.

### B. Gibson's Motion for Summary Judgment

Similar to Hollandsworth, Gibson asserts that the Court should grant summary judgment on Plaintiff's excessive force claim against

him because he is entitled to qualified immunity.  With respect to the first step of the qualified immunity analysis, Gibson asserts that, while his shots struck Plaintiff, he did not engage in excessive force during the events that took place on December 12, 2012. Instead, Gibson argues, he shot at Plaintiff based on a reasonable perception that "Tinsley appeared . . . to be in danger of being dragged, crushed, or run over by Moody's car as he attempted to flee." Mem. in Supp. of Gibson Mot. at 13.  With respect to the second step of the qualified immunity analysis, Gibson asserts that, even if he used excessive force, he is entitled to qualified immunity because he did not violate a clearly established constitutional right.

In response, Plaintiff argues that Gibson used excessive force because he began to fire his weapon before Plaintiff began "driving away, [and] his perception that Officer Tinsley was being drug was not reasonable as the vehicle was not moving."  Opp'n to Def. Gibson's Mot. for Summ. J. at 7.  Further, Plaintiff argues that qualified immunity is not warranted in this matter because, in light of the "totality of circumstances and information available to and perceived by Defendant Gibson, a reasonable officer would not have believe[d] that his conduct in using deadly force was lawful . . . ." Id. at 11.  The Court will address each step of the qualified immunity analysis in turn.

### 1. Constitutional Violation—Excessive Force

To determine whether an officer's actions are objectively reasonable, "[t]he focus, of course, is on what the police officer reasonably perceived at the time that he acted and whether a reasonable officer armed with the same information, would have had the same perception and have acted in like fashion." Lee, 100 F. Supp. 3d at 541 (citing Rowland, 41 F.3d at 173). Just as noted above with respect to Hollandsworth, it must be remembered that, in determining whether an officer acted in an objectively reasonable fashion, a court should consider, "'[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'"[18] Yates, 817 F.3d at 885 (quoting Graham, 490 U.S. at 396). Considering these factors, Gibson's conduct was objectively reasonable because another officer, armed with the same information that Gibson had, would have perceived that Plaintiff intended and attempted to flee arrest in a manner that placed Tinsley in imminent danger.

---

[18] Plaintiff also argues that the Court should consider the extent of his injuries in determining whether Gibson's conduct was reasonable. Opp'n to Def. Gibson's Mot. for Summ. J. at 11. As discussed above, such consideration is of limited relevance in the present matter. See supra n.15. As such, the Court will not consider the seriousness of Plaintiff's injuries in its determination of whether Gibson's conduct was reasonable.

### a. Severity of the Crime at Issue

With respect to the first factor, "severity of the crime at issue" weighs in Gibson's favor.  As discussed above, consideration of the "crime at issue" includes consideration of pending criminal charges and possible impending criminal activity, as perceived by Gibson, even though it had not yet occurred.[19]  See Anderson, 247 F.3d at 132; supra sect. III.A.2.a.  On December 12th, the officers sought to arrest Plaintiff on an outstanding federal warrant for drug and weapon charges.  During the arrest, Plaintiff disobeyed the officers' instructions and resisted arrest.  Gibson observed Plaintiff move to place his vehicle in gear and Tinsley go "forward and downward," along the side of Plaintiff's vehicle, causing Gibson to reasonably believe that Tinsley was in danger of being run over or dragged due to Plaintiff's imminent flight.  Thus, the "crime[s] at issue" in this matter are severe and include Plaintiff's outstanding drug and weapon charges, any charges related to Plaintiff's resistance to arrest, and potential charges for the imminent harm that Gibson perceived that Plaintiff would cause to Tinsley.

### b. Immediate Threat to Safety

As to the second factor, Plaintiff presents two arguments.  Plaintiff argues, first, that there is a dispute of material fact

---

[19] See supra n.16.

regarding the immediate threat posed by Plaintiff.  Second, Plaintiff argues, Gibson's perception that Tinsley was in danger was unreasonable.  The Court disagrees with Plaintiff's assessment on both grounds.

With respect to Plaintiff's first argument regarding this factor, Plaintiff relies on the unpublished cases of Lowery v. City of South Boston, No. 92-0004, 1993 WL 597439 (W.D. Va. Oct. 15, 1992) and Nolan v. Grim, No. 5:09cv39, 2010 WL 4929658 (W.D. Va. Nov. 30, 2010), to argue that the Court cannot resolve Gibson's Motion for Summary Judgment because the parties' versions of the facts are too divergent.  The Court acknowledges that certain facts, related to Gibson's conduct and perceptions, are in dispute in this matter. However, such disputes are not material because the undisputed evidence, considered in the light most favorable to Plaintiff (as this Court must), demonstrates that Gibson's perceptions were reasonable.  Thus, unlike Lowery and Nolan, the undisputed evidence in this matter alone is sufficient to demonstrate that Gibson reasonably perceived that Plaintiff posed an immediate threat to Tinsley's safety.

Plaintiff's second argument is that Gibson's perception that Plaintiff posed an immediate threat to Tinsley's safety was unreasonable because (1) Plaintiff did not drive away until after he heard the first gunshot, and (2) Gibson did not see Tinsley inside the passenger compartment of Plaintiff's vehicle.  Opp'n to Def.

Gibson's Mot. for Summ. J. at 10.   Essentially, Plaintiff argues that Tinsley could not have fallen or been dragged due to the car's movement because the car was not yet moving.   Such argument, however, does not undermine the reasonableness of Gibson's perception that Tinsley was in danger; it merely calls into question the mechanism by which Gibson observed Tinsley "going forward and downward" (i.e. the car's movement).   The cause of Tinsley's fall is immaterial on these facts.   The fall could have been caused by the ongoing melee of the arrest, or Tinsley tripping, or slipping on the overpass.   The undisputed evidence demonstrates that (1) Tinsley's "body broke the threshold [of Plaintiff's vehicle] to go in and take control of [Plaintiff's] arm . . . ."   Gibson Depo. at 42:2-11; Moody Depo. at 53:5-13; (2) while Tinsley was attempting to control Plaintiff, Plaintiff released the emergency brake on his vehicle; (3) Plaintiff then moved his hand to the gearshift, intending to place his vehicle into gear; (4) almost simultaneously, Gibson observed Tinsley "going forward and downward," Gibson Depo. at 43:25-44:4, and believed that Tinsley "was somewhere near the lower half of the door," id. at 45:7-16.   Gibson perceived that Tinsley was in danger because he observed, nearly simultaneously, that Plaintiff was putting his vehicle in gear to flee and that Tinsley had fallen near the wheels of Plaintiff's vehicle.   Any reasonable officer would have perceived that Plaintiff's flight posed an immediate threat of harm or serious injury to Tinsley, who was falling near the wheels of the vehicle,

regardless of whether Plaintiff's vehicle had begun to move or was about to move.[20]   Thus, even presuming that, when Gibson shot, Plaintiff's vehicle had not yet moved forward and Tinsley was not inside Plaintiff's vehicle, Gibson had sound reasons to believe that Plaintiff posed an immediate threat to Tinsley's safety.

Similar to this Court's analysis on this issue, other courts have determined that an officer acted reasonably when, upon observing indicia of an individual's imminent flight and believing that such flight would place another officer in danger, such officer shot at the individual to prevent flight.   For example, in the case of Willis v. Oakes, 493 F. Supp. 2d 776 (W.D. Va. 2007), the court held that, while the parties disputed whether the vehicle at issue had begun to move at the time the officer shot and the extent to which another officer was in danger of being harmed due to the movement of the vehicle, the shooting officer acted in an objectively reasonable fashion when he shot to protect the other officer.   Id. at 783.   The Willis court determined that, based upon the undisputed evidence that (1) plaintiff had jumped into his vehicle, (2) put the key into the

---

[20] As Gibson's counsel persuasively explained during the May 5, 2016 hearing, "no officer can have perfect knowledge as to why Tinsley [was] going down on the other side.   It would be impossible for an officer in Gibson's position to be able to observe all facets of what was happening on the other side of the vehicle." Transcript at 111:19-24.   However, based solely on Plaintiff's view of the facts, Gibson reasonably perceived that Plaintiff posed an immediate threat to Tinsley's safety because "the emergency brake was being dropped down, the car was being taken out of park and into gear and that [the vehicle] was about to move forward . . . and Tinsley going down." Id. at 111:16-112:20.

ignition, (3) had shifted the vehicle into drive, and (4) was struggling with another officer at the driver's side window of the vehicle, the shooting officer was entitled to qualified immunity because "it was still objectively reasonable for [the officer] to believe that [the other officer] and other persons were in danger." Id. (citing Elliott, 99 F.3d at 641). Additionally, in Dorsey v. Ruth, 222 F. Supp. 2d 753 (D. Md. 2002), the court determined that an officer acted reasonably by shooting to stop the plaintiff, after observing the plaintiff take steps to place his vehicle in reverse and to accelerate in reverse towards another officer. Id. at 756-57; see also Tolliver v. City of Chicago, ___ F.3d ___, No. 15-1924, 2016 WL 1425865, at *7-8 (7th Cir. Apr. 12, 2016)(finding qualified immunity applied to officers who shot at an initially motionless vehicle that began moving forward while the officers were shooting, because "[r]easonable officers in their circumstances would have perceived the car as a deadly weapon that created a threat of serious physical harm. . . . Moreover, the officers had no way of knowing whether [the plaintiff] would accelerate, shortening the space and time to react"); Cass v. City of Dayton, 770 F.3d 368, 375 (6th Cir. 2014) (finding that "[a]n officer is justified in using deadly force against 'a driver who objectively appears ready to drive into an officer or bystander with his car'" (quoting Hermiz v. City of Southfield, 484 F. App'x. 13, 16 (6th Cir. 2012))); Clemons v. Knight, No. 8:14cv1376, 2015 WL 7430032, at *2 (M.D. Fla. Nov. 20, 2015)

46

(unpublished) (finding that an officer's use of a weapon was reasonable when the officer, who was located three to five feet in front of plaintiff's vehicle, observed the non-complaint plaintiff put his vehicle in drive and begin to accelerate towards him); Beasley v. Piekutowski, No. 4:02-CV-00823, 2005 WL 1463485, at *7 (E.D. Mo. June 21, 2005) (unpublished)(finding that an officer's use of a weapon was reasonable when the officer, located approximately five feet in front of the plaintiff's vehicle, saw the non-compliant plaintiff look directly at him and reach down to place the vehicle in gear). Therefore, even if the Court relies solely on Plaintiff's version of the facts in the record, Gibson had sound reasons to believe that Plaintiff posed an immediate threat to Tinsley's safety, because of Gibson's observation that Plaintiff was moving to place his vehicle into gear, and that almost simultaneously, Tinsley fell "forward and downward" alongside the vehicle.

### c. Actively Resisting or Attempting to Evade Arrest

Finally, with respect to the third factor of the test outlined in Yates, Plaintiff argues that his resistance and attempted flight "was a result of the officers refusing to provide him with information as to why he was being stopped and handcuffed."[21] Opp'n to Def. Gibson's Mot. for Summ. J. at 10. As discussed above, Plaintiff has

---

[21] Plaintiff again cites Cowles v. Peterson, 344 F. Supp. 2d 472 (E.D. Va. 2004), in support of his argument that the officers' actions caused him to resist arrest. However, as discussed previously, the Cowles case does not support Plaintiff's argument because it is factually inapposite. See supra sect. III.A.2.a

not demonstrated that the officers' attempts to arrest Plaintiff instigated Plaintiff's resistance or attempted flight. Instead, Plaintiff understood that he was being pulled over by police officers, and he pulled his hands away from Tinsley before asking any questions of the officers. As Tinsley attempted to take control of Plaintiff's hands, Gibson observed Plaintiff lower the emergency brake on his vehicle and attempt to shift his vehicle into gear, intending to drive away from the officers. Thus, Gibson reasonably perceived that Plaintiff was actively resisting arrest and attempting to flee at the time Gibson shot.

Therefore, Gibson did not engage in an unreasonable seizure by means of excessive force against Plaintiff. Based on the undisputed evidence in the record, Gibson acted reasonably because, while Plaintiff was resisting arrest, Gibson observed, almost simultaneously, Plaintiff move to place his vehicle in gear, intending to drive away, and Tinsley going "forward and downward."

### 2. Clearly Established Law

Alternatively, even if Gibson did use excessive force, he would still be entitled to qualified immunity because he did not violate a clearly established constitutional right. As discussed above, the "'salient question'" in determining whether a rule is clearly established "'is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" Tolan, 134 S. Ct. at 1866

(quoting Hope, 536 U.S. at 741).  At the time of the events in question, the state of the law did not provide Gibson with "fair warning" that his conduct violated a constitutional rule.

Plaintiff has not demonstrated, and the Court cannot find, that there is a pertinent, clearly established rule prohibiting an officer from shooting at a criminal suspect with an outstanding warrant, who is resisting arrest when such officer observes indicia of flight and perceives an imminent threat to another officer due to such flight. Instead, the Supreme Court has recognized in an analogous case that a constitutional right prohibiting an officer from "shoot[ing] a disturbed felon,[22] set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight" was not clearly established, and such conduct falls within the "'hazy border between excessive and acceptable force.'"  Brosseau v. Haugen, 543 U.S. 194, 198-200 (2004)(per curiam) (quoting Saucier, 533 U.S. at 206)).  Further, our Court of Appeals has recognized that an officer, making a split-second decision to fire his weapon at an individual, believing that a fellow officer was in danger of being harmed due to that individual's attempt to drive away, acts reasonably and does not violate the Fourth Amendment.  See Waterman

---

[22] While the Supreme Court uses the phrase "disturbed felon," the Court notes that the factual circumstances of the case make clear that the plaintiff did not suffer from an actual mental or physical disability.  Instead, such word is used to signal Defendant's apparent distress and desperation to flee.  See Haugen v. Brosseau, 339 F.3d 857, 880 (9th Cir. 2003) (Gould, J., dissenting) (noting that the plaintiff was "a desperate man taking desperate measures").

v. Batton, 393 F.3d 471, 478 (4th Cir. 2005) (finding that officers, making a split-second determination that the suspect was using his vehicle as a weapon, acted reasonably in using their weapons and had probable cause to believe that plaintiff's oncoming vehicle posed an immediate threat of serious physical harm to themselves and other officers); Pittman v. Nelms, 87 F.3d 116, 120 (4th Cir. 1996) (finding no Fourth Amendment violation when an officer, in a "tense, uncertain, and rapidly evolving" situation, shot at an individual driving away when he reasonably believed that such flight placed another officer in serious danger (citing Drewitt v. Pratt, 999 F.2d 774, 779-80 (4th Cir. 1993))).[23]  Further, our Court of Appeals has stated that:

---

[23] In his Opposition, Plaintiff attempts to distinguish the present case from Pittman v. Nelms, 87 F.3d 116 (4th Cir. 1996).  Plaintiff argues that Gibson's reliance on Pittman is misplaced, because the Pittman plaintiff was engaged in an extended flight from the police prior to shots being fired. Thus, Plaintiff argues, while the officer in Pittman was found to have qualified immunity for his shots, the case is inapplicable to the present matter because the officer in Pittman had additional reasons to support his firearm use against the plaintiff.  While Plaintiff is correct that the officer in Pittman had more background knowledge than Gibson did in the instant case, at the moment the officers shot, both Gibson and the officer in Pittman faced very similar circumstances.  In Pittman, the officer observed the plaintiff begin to drive away, and he saw another officer in the path of the plaintiff's flight.  Believing that the other officer was in danger, the officer shot at the plaintiff as he drove away. Based on the officer's perception that another officer was in danger, the Fourth Circuit determined that the shooting officer's conduct was reasonable and he was entitled to qualified immunity.  Thus, Pittman is applicable to the case at bar as it reflects the state of the law in existence at the time that Gibson shot.  Further, Pittman, as a published case in the Fourth Circuit, provides relevant precedent that Gibson could rely on to give him "fair warning" of what conduct might be allowed or prohibited under the Fourth Amendment.

> [N]o court can expect any human being to remain passive
> in the face of an active threat . . . . Before employing
> deadly force, police must have sound reason to believe that
> the suspect poses a serious threat to their safety or the
> safety of others. Officers need not be absolutely sure,
> however, of the nature of the threat or the suspect's
> intent to cause them harm—the Constitution does not
> require that certitude precede the act of self protection.

Elliott, 99 F.3d at 644.  Thus, even if Gibson had used excessive force against Plaintiff, he did not violate a clearly established constitutional right of Plaintiff.

Therefore, as an alternative holding to the Court's finding that Gibson is entitled to qualified immunity because he did not use excessive force against Plaintiff, Gibson is also entitled to qualified immunity because he did not violate a clearly established constitutional right of Plaintiff.  As such, Gibson's Motion for Summary Judgment is **GRANTED** on both prongs of the qualified immunity analysis and he is **DISMISSED** from this action.

### IV. CONCLUSION

The events that took place on December 12, 2012 were devastating and tragic, and the Court recognizes that Plaintiff's injuries have drastically altered his way of life.  However, the state of the law regarding the issues presented is clear, and the Court must grant Defendants' motions.

For the reasons discussed above, Defendant Hollandsworth's Motion for Summary Judgment, ECF No. 59, is **GRANTED**, and Defendant Gibson's Motion for Summary Judgment, ECF No. 62, is **GRANTED**.  As

a result of the Court's rulings in these matters, both Defendants Hollandsworth and Gibson are **DISMISSED** from the present action.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

/s/ M⬚⬚

Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
June *16* , 2016